UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | } |
| | } |
| v. | } Case No.: 2:18-cr-00103-RDP-JEO |
| | } |
| PATRICK EMEKA IFEDIBA, and | } |
| JUSTINA NGOZI OZULIGBO, | } |
| | } |
| Defendants. | |

**MEMORANDUM OPINION**

This case is before the court on the United States' 404(b) Notice and Notice of Intent to Use Evidence (Doc. # 85). In that notice, the Government states its intent to introduce evidence concerning certain financial matters and a bankruptcy proceeding involving Defendant Patrick Ifediba ("Ifediba") and evidence that he engaged in unwanted sexual advances and other sexual conduct with his patients at his medical office. The court held a conference on the matter with counsel on February 8, 2019. For the reasons stated on the record at the conference and in this Memorandum Opinion, the court concludes as follows: (1) that some of the financial and bankruptcy-related evidence the Government intends to offer is inadmissible and (2) that the evidence of Ifediba's sexual conduct may be offered, if at all, only as rebuttal evidence in the event Ifediba puts certain matters at issue in his own case in chief.

I. **The Bankruptcy-Related Evidence**

The financial and bankruptcy-related evidence the Government intends to offer may be summarized as follows:

1. Evidence that Ifediba defaulted on approximately $2.5 million in loans from BB&T Bank in March 2010 and that BB&T thereafter obtained a judgment against Ifediba for approximately $3.7 million in November 2012, due to his

failure to repay the loans.

2. Evidence that after failing to respond to discovery requests BB&T had issued seeking to identify additional assets to satisfy the judgment, Ifediba filed a Chapter 7 bankruptcy petition in April 2013.

3. Evidence that in April 2013 Ifediba changed the name of his clinic and opened several new bank accounts for himself, his clinic, "Happy Monica" (a shell company owned by Ifediba's mother), and his mother Benedeth Ifediba—all of which he controlled.

4. Evidence concerning Ifediba's 2014 sworn deposition testimony in the bankruptcy proceedings, which the Government contends contained false statements. The deposition testimony concerned the March 2010 "sale" of Ifediba's clinic's real property to Happy Monica for approximately one-third of the property's appraised value, whether Ifediba knew who "Benedeth Ifediba" (his mother) was, and whether the clinic property was in fact "sold" to Happy Monica. The deposition testimony also concerned a series of fund transfers totaling nearly $2 million Ifediba made to Nigeria between March 2010 and November 2012.

5. Evidence that BB&T settled its case with Ifediba for approximately 12% of the judgment value and that Ifediba paid the settlement using proceeds from the alleged crimes in this case.

6. Testimony proffered by co-Defendant Clement Ebio that Ifediba admitted his bankruptcy was a fraud and he had moved the $2 million to Nigeria before filing his bankruptcy petition and falsely claimed that the money was used as a ransom payment for a kidnapped sister.

The Government contends the above evidence is either inextricably intertwined evidence to which Rule 404(b) does not apply or admissible under Rule 404(b) in any event. *See United States v. McNair*, 605 F.3d 1152, 1203 (11th Cir. 2010) ("Rule 404(b) does not exclude evidence that is 'inextricably intertwined' with evidence of the charged offense."); Fed. R. Evid. 404(b)(2) (stating that prior act evidence "may be admissible for" the purpose of "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident").

The Government asserts the healthcare fraud and money laundering conspiracies alleged

in this case began in May 2013. There is nothing before the court to suggest that the $2 million transfer to Nigeria, which occurred before the alleged conspiracy period, is connected to any of the property or funds used in or derived from the healthcare conspiracy; therefore, that evidence is not inextricably intertwined with the charged crimes. The court also finds that evidence of the fund transfer is inadmissible under Rule 404(b) because the risk that the jury will consider the evidence for the prohibited propensity purpose substantially outweighs its limited probative value.

However, the court finds that the other bankruptcy-related evidence is either inextricably intertwined evidence or admissible under Rule 404(b) in any event. The bankruptcy petition was filed shortly before the conspiracy period commenced, and the Government contends Ifediba's allegedly false deposition testimony during the bankruptcy proceedings (which also occurred during the alleged conspiracy period) was designed to hide money from BB&T at the time Ifediba was (1) engaged in an illegal money-making healthcare-fraud scheme and (2) laundering the proceeds from those activities. That evidence is therefore inextricably intertwined with Ifediba's alleged conspiracy to acquire and conceal his clinic's allegedly ill-gotten gains. And, the evidence of Ifediba's loan default and the subsequent judgment in favor of BB&T is necessary background information that explains why Ifediba filed for bankruptcy and why BB&T was trying to collect money from Ifediba.

The evidence of Ifediba's deposition testimony concerning the sale of his clinic property to Happy Monica and subsequent "rent" payments to Happy Monica is also inextricably intertwined with the charged conduct, as it tends to show how Ifediba managed the premises the Government contends he later used to carry out the alleged conspiracy, and that he maintained control over those premises at all relevant times. Finally, the fact that he used proceeds derived

from his allegedly criminal activity to settle BB&T's claim against him—and managed to convince BB&T to settle for 12% of what it was owed, thus freeing up more alleged criminal proceeds for other uses—is inextricably intertwined with the money laundering charges the Government seeks to prove. The bankruptcy-related evidence, with the exception of the $2 million fund transfer to Nigeria, is therefore admissible.

## II. The Sexual Conduct Evidence

The Government also gave notice of its intent to offer testimony from former patients and staff members of Ifediba concerning sexual conduct he engaged in at his medical office. The Government contends this testimony will provide additional evidence that the controlled substances Ifediba prescribed were not for a legitimate medical purpose in the context of a bona fide doctor-patient relationship. The Government expects Ifediba to contend in his case in chief that he prescribed controlled substances for legitimate medical purposes in the usual course of a professional medical practice.

At the conference, the court informed counsel that it viewed this evidence as relevant to rebutting any evidence the Defense might offer to establish that Ifediba's prescribing practices were made in the course of a legitimate professional practice of medicine. The Government agreed to proffer the evidence of Ifediba's sexual behavior only as rebuttal evidence, if at all, in the event Ifediba contends that his prescribing of pain medicine was for legitimate medical purposes. Therefore, the court will consider the admissibility of this evidence prior to any rebuttal case (if the Government seeks to offer it as rebuttal evidence), and will at that time have a better context to rule on any Defense objections to its admissibility.

DONE and ORDERED this February 12, 2019.

_____
R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE