UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, } | |
| } | |
| v. } | Case No.: 2:18-cr-00103-RDP-JEO |
| } | |
| PATRICK EMEKA IFEDIBA and NGOZI } | |
| JUSTINA OZULIGBO, } | |
| } | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on the United States' Motion to Preclude the expert testimony of Dr. Daniel A. Schwarz (Doc. #151). Dr. Schwarz was designated as an expert by Defendant Ifebida. There are unique issues in this case based upon the timing of the expert disclosure by Ifebida. Although the Government objects to Dr. Schwarz's testimony, it has not filed a formal motion to exclude Schwarz's proposed testimony because the report was only produced on the Friday before trial started. The court allowed the late disclosure because the Government would have time to review the report and the court would have an opportunity to conduct a *Daubert* hearing to more thoroughly evaluate Schwarz's proposed testimony. (See Doc. # 162 at 3-4). The Government's objections to Dr. Schwarz's testimony were lodged after those events. For the reasons explained below, the motion (Doc. #151) is **GRANTED IN PART and DENIED IN PART**.

I. **Legal Standard**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny, Rule 702 requires district courts to perform a critical "gatekeeping" function concerning the admissibility of scientific and technical expert testimony. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*). To perform their role as gatekeeper, courts "engage in a rigorous three-part inquiry." *Id.* District courts must consider whether: "(1) the expert is *qualified* to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently *reliable* as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony *assists the trier of fact*, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* (emphasis added) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Though there is some overlap among them, these three basic requirements -- qualification, reliability, and helpfulness -- are distinct concepts which the district court must be careful not to conflate. *Id.*

The proponent of expert testimony always bears the burden to show that the requirements of qualification, reliability, and helpfulness are met. *Id.* That remains true whether the proponent is the Government or the accused in a criminal case. *Id.* And in addition to Rule 702, Rule 403 also applies to expert testimony. *Id.* at 1263. Thus, expert testimony that is otherwise admissible under Rule 702 and *Daubert* may still be excluded under Rule 403 if the probative value of the

testimony "is substantially outweighed by its potential to confuse or mislead the jury." *Id.*

### A. Expert Qualifications

Experts may be qualified in various ways, including training, education, or experience in a given field. *Id.* at 1260-61. Often what is at issue under the qualification prong is not whether the proffered expert is qualified in the abstract, but whether his training, education, or experience qualify him to render an opinion on a *specific topic*. Particularly where an expert's qualifications rest on his experience (as opposed to scientific or technical training), the expert "must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* at 1261. It is not enough for the court to simply take the expert's word for it. *Id.*

### B. Reliability of the Expert's Opinion

Before admitting expert testimony, trial judges must determine that the testimony is (1) based on reliable facts or data; (2) the product of reliable principles and methods; and (3) based on a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702. When evaluating scientific expert opinion, courts consider the following factors in making those determinations: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Frazier*, 387 F.3d at 1262.

Those same criteria may also be used to evaluate the reliability of "non-scientific, experience-based testimony." *Id.* But importantly, "[t]hese factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Id.* Sometimes these factors "will aid in

determining reliability; sometimes other questions may be more useful." *Id.* The bottom line is that trial judges have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* "Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Id.*

### C. Helpfulness to the Trier of Fact

Finally, expert testimony under Rule 702 must assist the trier of fact. Expert testimony is helpful to the trier of fact if it "concerns matters that are beyond the understanding of the average lay person." *Id.* Expert opinion generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63.

Additionally, expert testimony is only helpful to the trier of fact if there is "an appropriate 'fit' with respect to the offered opinion and the facts of the case." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). In other words, "expert testimony must be relevant to the task at hand"; it must "logically advance[] a material aspect of the case." *Id.* at 1298-99 (internal quotation marks omitted). There is no "fit" when, for example, "a large analytical leap must be made between the facts and the opinion." *Id.* at 1299.

## II. Analysis

Ifediba designated Dr. Schwarz as an expert to testify at his trial. One of the challenges in this case is that Dr. Schwarz's designation was very late. This was not the fault of Ifediba or his counsel. At least two experts previously designated by Ifebida changed their minds and elected not to testify at trial. In fact, the court continued this case from an earlier trial date (over the Government's strenuous objection) to allow Ifediba to find a new expert. On the eve of trial, Ifediba disclosed the report of Dr. Schwarz. The Report was three days late and not provided to

the Government until 5:00 p.m. on the Friday before trial. Again, the Government objected to Ifebida's expert. The court concluded that a *Daubert* hearing should be conducted to (1) allow the court to exercise its gatekeeping function as to the admissibility of Dr. Schwarz's testimony and (2) permit the Government the opportunity to understand (and prepare for) the scope of Dr. Schwarz's testimony.

Based on his report and testimony at the Daubert hearing, Dr. Schwarz was proffered to testify regarding Ifediba's opioid prescribing practices. The Government opposed the admission of his testimony. The expert report submitted by Dr. Schwarz generally indicated that he would offer two main opinions.

First, in the patient files he reviewed, Dr. Schwarz opines he did not observe gross overprescribing, inappropriate increases in opioids, or many "Holy Trinity" prescriptions by Ifediba. What he instead saw was, according to him and unfortunately at that time, the average or near-average opioid prescriptions for primary care doctors "trying to treat patients with mild pain issues." In short, he concluded that Ifediba's prescribing practices were for a legitimate medical purpose and/or within the usual course of medical practice for a primary care physician at the relevant time using opioids to treat mild pain.

Second, Dr. Schwarz believes that the Government's expert, Dr. Kauffman, should not have evaluated Ifediba's prescribing practices based on the 2016 Board Rules and CDC guidance. In March 2016, the CDC issued new guidelines for prescribing opioids that, according to Dr. Schwarz, resulted in a significant change in the amount of opioids which should be prescribed. Dr. Schwarz also criticizes Dr. Kauffman as "showing more of reading/deskwork and not actual clinical or evidence-based pain management."

There is not an issue about Dr. Schwarz's qualifications. He graduated from the

University of Illinois at Chicago Medical School in 1988. He completed a surgery residency at the University of Toledo in 1993. He completed an addiction medicine fellowship, and since 2011, he has had a clinical practice in pain management and addiction medicine in both Michigan and Ohio. He is a board-certified addiction medicine physician. Dr. Schwarz thus appears qualified to testify regarding whether Ifebida's prescribing practices were for a legitimate medical purpose and/or within the usual course of medical practice for a primary care physician prescribing opioids to treat pain. Indeed, the parties have stipulated to Dr. Schwarz's qualifications, and the Government does not argue Dr. Schwarz's qualification. (*See* Doc. # 162 at 6).

The remaining questions are whether Dr. Schwarz's opinions are reliable (*i.e.*, has he used a proper methodology in reaching his opinions) and helpful (*i.e.*, does his proposed testimony "concern[] matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (*en banc*)). Physicians' prescribing practices are generally beyond the understanding of the average lay person. So, at least to the extent relevant to the issues in the case, if otherwise admissible, the proffered opinions will likely be helpful the trier of fact.

The key issue to be resolved is whether Dr. Schwarz's opinion testimony is reliable. To determine whether Dr. Schwarz's opinions have a reliable basis and are the product of a reliable method, the court held a *Daubert* hearing on July 5, 2019.

Dr. Schwarz's report states that he reviewed 25[1] charts from Ifediba's practice which included the prescriptions charged in the indictment. Dr. Schwarz was instructed to disregard the additional file that was inadvertently sent. (Doc. # 162 at 7-10). Because the charts reviewed by Dr. Schwarz relate directly to the prescriptions charged in the indictment, they form a reliable

---

[1] Dr. Schwarz initially reviewed one extra file, but the parties agree it is irrelevant to the issue in this case.

basis for Dr. Schwarz to opine on whether Ifebida's prescribing practices were for a legitimate medical purpose and/or within the usual course of medical practice for a primary care physician.

Dr. Schwarz is familiar with the general, nationwide regulations applicable to pain management and prescription of opioids through his practice as an addiction medicine physician. For approximately five years, Schwarz also had an opportunity to lecture with a Division Director of the Drug Enforcement Agency in an effort to educate primary care physicians regarding the "dos and don'ts" of prescribing opioids. (Doc. # 162 at 17-18). However, he conceded he did not have familiarity with the particular prescribing standards applicable in Alabama. (Doc. # 162 at 11-12, 15-16). At the *Daubert* hearing, he was candid with the court and admitted that, with one exception[2], he had not reviewed the Alabama Board of Medical Examiners' rules regarding relevant aspects of the practice of medicine in this state. Obviously, to testify about any Alabama-specific standard of care in this case, an expert such as Dr. Schwarz would be required to know (and understand) Alabama-specific rules about practicing medicine. Although at the hearing Dr. Schwarz indicated that he could, prior to testifying, get up to speed on these rules, nothing in his report signaled that he would state any opinion in this area. The *Daubert* hearing was held during the second week of trial. It was too late to allow him to develop another line of opinion testimony because doing so after the *Daubert* hearing would not have permitted (1) the court the opportunity to perform its gatekeeping function (to make sure that any opinion testimony in that area was reliable and helpful) or (2) the Government a fair opportunity

---

[2] Dr. Schwarz's report addresses Alabama State Board of Medical Examiners Rule and Regulations, 540-X-4-.09, "Requirements for the Use of Controlled Substances for the Treatment of Pain." That regulation recognizes and describes concerns (a) that under-prescribing due to "fears of investigation or sanction by federal, state and local regulatory agencies may [] result in inappropriate or inadequate treatment of chronic pain patients," and (b) "tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not synonymous with addiction."

to adequately prepare for that opinion testimony.[3]

Nevertheless, the court concluded that Dr. Schwarz could offer opinion testimony as to whether Ifebida complied with a more general standard of care based upon the following: (1) whether in his opinion the prescriptions at issue in this case were written for a legitimate medical purpose; (2) whether the prescribing practices of Ifediba that are at issue in this case were undertaken in the usual course of professional practice; and (3) how 2016 CDC Guidelines bear upon these questions. However, the court concluded he cannot testify that any activities at issue were consistent with any Alabama standard of care (or another state's specific standard of care). And similarly, the court ruled Dr. Schwarz could not testify to some nebulous standard of care.

There are other matters the court permitted Dr. Schwarz to testify about. Through his practice and lecturing, Dr. Schwarz has familiarity with the concept of the "holy trinity." From approximately 2013 to 2016, the "holy trinity" consisted of (1) hydrocodone, (2) Xanax (a short acting benzodiazepine), and (2) Soma (a muscle relaxant). (Doc. # 162 at 23-24). He is also aware that there is a lag time between a pain specialist's or the DEA's knowledge that a particular new drug is associated with certain dangers before primary care physicians become familiar with those dangers and adjust their prescribing practices. (Doc. # 162 at 23-26).

For the time-period 2013 to 2016, Dr. Schwarz explained that the usual course of medical practice for a primary care physician to prescribe controlled substances involved an evaluation of (1) the onset or cause of the pain, (2) the quality or extent of the pain, and (3) the patient's goals. (Doc.# 162 at 38-39). To formulate his opinions regarding Ifebida's prescribing practices, Dr. Schwarz reviewed the applicable patient records and spoke to Ifediba regarding his physical

---

[3] Indeed, at the July 5, 2019 *Daubert* hearing, the Government expressed concern regarding Dr. Schwarz's ability to opine as to the "very well documented and established standard of care as set forth by the Alabama Board of Medical Examiners that was in effect prior to 2013 and then slightly amended after 2013." (Doc. # 162 at 52). Counsel for the Government pointed out that Dr. Schwarz testified that he did not apply that standard.

examinations. (Doc. # 162 at 36-37). He also planned to review videotapes of the examinations of four undercover agents. (Doc. # 162 at 36-37).

"The court has considerable leeway in determining what is reliable, as long as it its determination is done in light of the *Daubert* factors." *United States v. Watkins*, 880 F.3d 1221, 1227 (11th Cir. 2018) (citing *Frazier*, 387 F.3d at 1262). "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Frazier*, 387 F.3d at 1262. "Rule 702 expressly contemplates that experts may be qualified based on experience." *Id.* at 1264.

The Government also expressed concern that there was a very late disclosure of Dr. Schwarz's opinions, but the court found that the limits placed upon Dr. Schwarz's testimony substantially cured any such prejudice. The court also found that any remaining concerns the Government had with respect to Dr. Schwarz's testimony go to the weight of Dr. Schwarz's testimony, rather than its admissibility. These are issues which counsel can explore on cross examination. *See Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)), *aff'd*, 609 F.3d 1183 (11th Cir. 2010) (so long as a proffered witness is "minimally qualified," a defendant's challenge to specific deficiencies in his or her experience goes "to credibility and weight, not admissibility."). The Government will be able to address any purported objectionable opinions through "[v]igorous cross-examination" and the "presentation of contrary evidence." *Daubert*, 509 U.S. at 596.

**III.  Conclusion**

For the reasons explained above, and consistent with the court's ruling in open court

(Doc. # 162 at 54-82), the United States' motion to exclude the expert testimony of Dr. Schwarz is **GRANTED IN PART AND DENIED IN PART.** It is further **ORDERED** as follows:

1. Dr. Schwarz will be allowed to testify to -- from an opinion-based fact standpoint -- the elements in the CDC and/or DEA guidelines: (a) whether there was prescription practice for legitimate medical purposes, and (b) whether it was within the scope of professional medical practice.

2. Dr. Schwarz may not testify to any Alabama-specific standards.

3. Dr. Schwarz may not testify based on a comparison of Ifediba's conduct to a "lowest common denominator" standard of care in the community. Whether or not overprescribing occurred among other Alabama physicians at any point in time is not relevant to what happened in this case.

4. Dr. Schwarz will be allowed to testify to areas where he disagrees with the Government's expert, Dr. Kaufman and may comment upon and/or criticize his testimony as appropriate.

DONE and ORDERED this July 15, 2019.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE